# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CYNTHIA PAULS,<br>    Plaintiff,<br><br>V.<br><br>THE PRUDENTIAL INSURANCE<br>COMPANY OF AMERICA and PRUCO<br>LIFE INSURANCE COMPANY,<br>    Defendants. | § § § § § § § § § § | CIVIL ACTION NO. 3:16-cv-02116-M |

## EXPERT REPORT

### ASSIGNMENT

Based on my tenure as a reinsurance underwriter and senior executive for two U.S. life reinsurers, I have been asked by counsel for Pruco Life insurance Company (hereinafter "Pruco") to offer an opinion regarding the life insurance coverage on David G. Ballinger (hereinafter "Ballinger") issued by Pruco under Policy No. L9136771, with an issuance date of November 6, 2014. Ballinger died on May 27, 2015. Upon submission of a claim for benefits by Cynthia Pauls (hereinafter "Pauls"), Pruco denied payment alleging that Ballinger had made material misrepresentations in his application for the life coverage.

I have been asked to offer an opinion as to whether any of Ballinger's answers in his application for life insurance were a misrepresentation as to the underwriting of his person for life insurance. For the reasons set out below, my opinion is that there is clear evidence that Ballinger made misrepresentations on the application with the intent to have Pruco issue life coverage. Further, it is my opinion that Pruco would have not issued coverage on Ballinger if his complete medical history had been known to Pruco at the time his application was underwritten.

It is also my opinion that Pruco's underwriting of Ballinger was correct and followed normal and customary professional underwriting practices. Pruco's underwriting was reasonable and prudent based upon the information disclosed by Ballinger at the time the application with medical questions was completed. Based on Pruco's age and amount requirements, Pruco would not have requested an Attending Physician's Statement (hereinafter "APS," defined as "medical records") from a medical provider as a customary underwriting requirement. However, if Ballinger had disclosed his full medical history on the application, it would have been normal and customary

1 Expert Witness Report, J. Daniel Perkins

underwriting practice for Pruco to obtain an APS for Ballinger's diagnosis, diagnostic testing, and treatment regarding his prostate history.

In connection with my preparation of this report, I have reviewed some of the court filings, discovery, and document production between the parties. Since I may receive additional information in the future regarding this matter, I reserve the right to incorporate the additional information into my analysis and revise my opinions accordingly.

The attached Exhibit A provides details as to my background and qualifications; publications authored in the last fourteen years; list of cases where I provided expert testimony; and a statement of compensation.

## ANALYSIS

**A. Opinion on whether any of Ballinger's answers in his application for life insurance regarding his medical history were a misrepresentation as to the underwriting of his person for life insurance, and were his answers made with the intent to have Pruco issue life coverage.**

**Ballinger's answers to the policy application, Part 2, Section D, Questions 1.j., 4.b., 4.c., and 4.d. were misrepresentations on the application with the intent to have Pruco issue life coverage.**

1. During the claims review of a contestable life insurance claim, it is normal and customary industry practice to review the medical information for the insured as of the time of policy issuance and not medical information that manifest or occurs after the policy was issued. The purpose of this review is to determine if the proposed insured made any misrepresentations regarding his or her insurability based on the questions asked during the underwriting process.

2. The policy underwritten by Pruco and issued on the life of Ballinger is Policy No. L9136771 (hereinafter "Policy") with an effective date of November 6, 2014, with a death benefit of $500,000. The Policy's Contract Data state that the Policy was a term product, 57 male was the issue age and gender, and the risk class was select Preferred Non-Tobacco (PRUCO 000003).

3. Pruco's rescission letters dated January 25, 2016 and October 12, 2015 addressed to Pauls, who was the policy owner and beneficiary on the Policy, was notice of Pruco's intent to deny payment of the Policy death benefit and rescind the Policy (PRUCO 000069—70) and PRUCO 000113—4).

4. In denying the claim for benefits, Pruco cited Questions 1.j., 4.b., 4.c., and 4.d. of the Application Part 2, Section D, entitled "Medical Information," and stated Ballinger had misrepresented his medical history by failing to disclose the blood work and medical

2 Expert Witness Report, J. Daniel Perkins

testing relating to his prostate at the time of application for this policy. Further, had the information been provided to Pruco at that time, the policy would not have been issued.

5. In addition, Application Part 2, Section D, Question 6, states to "Give complete details of any "Yes" answers for questions 1 – 5, including: Question number, diagnosis, date of onset and recovery, medication/treatment prescribed and the name, address and telephone number of all attending physicians and hospitals."

**Question 1.j.**

6. Application Part 2, Section D, Question 1.j. asked "Has a member of the medical profession ever treated you for or diagnosed you with: nephritis, polycystic kidney disease or any other disorder of the bladder, kidney, urinary tract or prostate" to which Ballinger answered "No" (PRUCO 000017).

7. Ballinger made misrepresentations on the application with the intent to have Pruco issue life coverage when he failed to answer Question 1.j. as "Yes" for his history of benign prostatic hypertrophy (hereinafter "BPH"), elevated prostate specific antigen (hereinafter "PSA") levels, and the results of his 8-12-13 prostate biopsy (PRUCO 000187) which stated "prostate tissue with small focus of atypical glands, suspicious for carcinoma, high-grade prostatic intraepithelial neoplasia cannot be excluded with certainly."

8. As early as 1-20-13 (or1-28-13), Dr Digiglia's medical records listed BPH as an Impression/Diagnosis (PRUCO 000258). Per the Cross-Questions To Be Propounded To the Witness, Custodian Of Records For: John A. Digiglia III, M.D., Dated October 26, 2016, Question 11, Ballinger was diagnosed with a disorder of his prostate on 7-23-13, and per Question 12, Ballinger was provided treatment for his prostate on 8-1-13 and 8-21-13.

9. The 7-23-13 diagnosis date coincides with the elevated PSA of 4.58 from 7-16-13 (PRUCO 000256, 000180, & 000184), and the treatment dates coincide with the consultation and diagnostic tests conducted by Dr. Saddiq (PRUCO 000156—7 & 000151—2).

10. Undoubtedly, any differential diagnosis presented to Ballinger during the July/August 2013 consultations would include the possibility of prostate cancer which is one of the most commonly diagnosed malignancies in males.

11. Ballinger was diagnosed via the prostate biopsy of 8-12-13 (PRUCO 000187) with atypia glands of the prostate where the findings were suspicious for prostate cancer but which at that time lacked sufficient cytologic and/or architectural atypia to establish a definitive diagnosis.

12. Ballinger failed to state that he was being seen by an urologist, Dr. Saddiq, for his diagnosis of BPH, that his prostate biopsy had abnormal findings, that he was under ongoing surveillance regarding his prostate history with PSA and Digital Rectal Exam (hereinafter

3 Expert Witness Report, J. Daniel Perkins

"DRE"), and that he visited Dr. Saddiq 8-18-14 (PRUCO 000144) less than 2 months before applying for life coverage with Pruco.

13. Based on the medical records cited and my professional underwriting background and experience, it is my opinion that Ballinger's answer of "No" to question 1.j. was not correct and done with the intent to have Pruco issue life coverage on his person.

**Question 4.b.**

14. Application Part 2, Section D, Question 4.b. asked "Other than what has already been disclosed, within the past 5 years, have you: been a patient in a hospital or other medical facility, other than for normal childbirth?" to which Ballinger answered "Yes" (PRUCO 000017).

15. Ballinger made misrepresentations on the application with the intent to have Pruco issue life coverage when he failed to answer Question 4.b. as "Yes" for his being a patient in an "other medical facility" which would have been the offices of Dr. Saddiq.

16. Ballinger failed to state that he was being seen by an urologist, Dr. Saddiq, for his diagnosis of BPH, that his prostate biopsy had abnormal findings, that he was under ongoing surveillance regarding his prostate history with PSA and DRE, that he had a CT of the abdomen and pelvis performed 8-15-13 for his history of microhematuria (PRUCO 000189), and that he visited Dr. Saddiq 8-18-14 (PRUCO 000144) less than 2 months before applying for life coverage with Pruco.

17. Based on the medical records cited and my professional underwriting background and experience, it is my opinion that Ballinger's answer of "No" to question 4.b. was not correct and done with the intent to have Pruco issue life coverage on his person.

**Question 4.c.**

18. Application Part 2, Section D, Question 4.c. asked "Other than what has already been disclosed, within the past 5 years, have you: had any other disease, disorder or condition?" to which Ballinger answered "No" (PRUCO 000017).

19. Ballinger made misrepresentations on the application with the intent to have Pruco issue life coverage when he failed to answer Question 4.c. as "Yes" for his history of BPH, elevated PSA levels, and the results of his 8-12-13 prostate biopsy (PRUCO 000187).

20. A common medical definition for "disease" is any abnormal condition, affecting either the whole body or any of its parts, which impair normal functioning. A common medical definition for "disorder" is a disturbance of function or health. A common medical definition for "condition" is a state or health or malady. (Melloni's Illustrated Medical

4 Expert Witness Report, J. Daniel Perkins

Dictionary, Fourth Edition, 2002, Parthenon Publishing Group). Based on my experience, these definitions are commonly understood by non-medically trained individuals.

21. Ballinger's history of BPH fits within all three of these common definitions since the medical records state a diagnosis of BPH. For the elevated PSA and the findings on the prostate biopsy, these two histories at a minimum, fit the definitions of disorder and condition.

22. Based on the medical records cited and my professional underwriting background and experience, it is my opinion that Ballinger's answer of "No" to question 4.c. was not correct and done with the intent to have Pruco issue life coverage on his person.

**Question 4.d**

23. Application Part 2, Section D, Question 4.d. asked "Other than what has already been disclosed, within the past 5 years, have you: been advised to have surgery, medical tests or diagnostic procedures (other than for HIV)?" to which Ballinger answered "No" (PRUCO 000017).

24. Ballinger made misrepresentations on the application with the intent to have Pruco issue life coverage when he failed to answer Question 4.d. as "Yes" for medical tests/ diagnostic procedures on 8-12-13 of cystourethroscopy, transrectal ultrasound of the prostate, and ultrasound guided biopsy of the prostate (PRUCO 000181—2). Also not admitted to were the PSA tests conducted 1-24-13 with results 2.03 (PRUCO 000232), 7-16-13 with results 4.58 (PRUCO 000180), 2-11-14 with results 1.7 (PRUCO 000180), and 8-18-14 with results 1.79 (PRUCO 000180). Also not admitted to was the CT of the abdomen and pelvis performed 8-15-13 for Ballinger's history of microhematuria (PRUCO 000189).

25. Starting in August 2013 and continuing through the time of Pruco's underwriting in October/November 2014, Ballinger sought medical consultation specifically for his prostate condition/disorder and/or disease of BPH on at least the following dates: 8-1-13, 8-12-13, 8-21-13, 2-17-14, and 8-18-14. These consultations included diagnostic procedures. In addition, Ballinger was considered under medical surveillance for his prostate related history which included the possibility of a future repeat prostate biopsy

26. Based on the medical records cited and my professional underwriting background and experience, it is my opinion that Ballinger's answer of "No" to question 4.d. was not correct and done with the intent to have Pruco issue life coverage on his person. Ballinger failed to admit to any of the testing and/or diagnostic procedures associated with a history of prostate disorders.

**Intent**

5 Expert Witness Report, J. Daniel Perkins

27. Based on the answers given by Ballinger on Questions 1.j., 4.b., 4.c., and 4.d. of the Application Part 2, Section D, entitled "Medical Information," the extensive medical consultations for prostate related disorders, and the differential diagnosis which would certainly include possible prostate cancer, one of the most common malignancies in males; it is clear that Ballinger's failure to admit to his prostate history could only have been done with the intent to have Pruco issue life coverage on his person.

28. From my review of the underwriting file I noted a comment dated 11-24-14 (PRUCO 000954) where Pauls attempted to justify the amount and purpose of the life coverage as owner & beneficiary by stating the following: . . . His pensions are about 100K per year and if he dies, she gets nothing, the income is gone from his pension, and they have joint financial responsibilities. . . She is paying for the policy and owner because she lost her husband 3 years ago to cancer and he only had a small policy at work. She is terrified of this happening again.

29. Under the Agreements section of the application (PRUCO 000019) it states "By signing this form, I have carefully reviewed the application including all supplements attached to the policy, and I agree to the following: Any policy issued on this application shall not take effect until after all of the following conditions are met: The Owner has personally received the policy during the lifetime of and while the health of the Proposed Insured is as stated in this application." From the medical records cited in this report and from my analysis above, Ballinger's health was not as stated in the application since he failed to admit to any medical history regarding his prostate.

30. Pauls' deposition testimony of February 6, 2017 clearly states she had knowledge of Ballinger's medical consultation with Dr. Saddiq and that he was an urologist by admitting she accompanied Ballinger to Dr. Saddiq on the date of prostate biopsy (Pauls' Deposition page 40, lines 22—5; page 43, lines 9—24; page 44, lines 1—6; and page 54, lines 11—25). As previously noted, the date of the prostate biopsy was 8-12-13. Pauls clearly had knowledge at the time the Pruco application was taken 10-7-14 that Ballinger had consulted with another doctor in addition to Dr. Digiglia, and that the consultation was with an urologist who performed diagnostic procedures at a medical facility other than the office of Dr. Digiglia.

31. Based on my professional underwriting background and experience, it is my opinion that Ballinger intended to deceive Pruco into issuing life coverage on his person by not admitting to his prostate history. Further, Pauls' knowledge of Ballinger consulting with an urologist, Dr. Saddiq, could also be viewed as intending to deceive Pruco into issuing life coverage on Ballinger.

**B. Opinion as to whether Pruco would have issued coverage on Ballinger if his prostate history had been known to Pruco at the time his application was underwritten.**

**Based on the unadmitted medical history that could have been available at the time Pruco underwrote Ballinger for life coverage, and Pruco's underwriting guidelines, Pruco would have postponed consideration for life coverage and not issued the Policy.**

32. During the claims review of a contestable life insurance claim, it is normal and customary industry practice to review the medical information for the insured as of the time of policy issuance to determine if the proposed insured made any misrepresentations regarding his or her insurability based on the questions asked during the underwriting process. If there are any misrepresentations, the second inquiry is whether any of these misrepresentations resulted in an insurer assuming a risk that it otherwise would not have accepted.

33. From the underwriting file, it appears the telephone interview asking all of the questions that formed the application, including the Part 2 medical questions, was completed on or about 10-7-14 and submitted to Pruco on 10-15-14 (PRUCO 000917—27). Based on Pruco's age and amount requirements for an individual age 57-58 applying for $500,000 of life coverage (PRUCO 000995), Pruco obtained an ECG (Electrocardiogram), Exam (limited to a measurement of Ballinger's height, weight, blood pressure readings, and pulse), and an IRP (Insurance Risk Profile (Comprehensive Blood and Urine Panel)). These requirements were completed on Ballinger on November 7, 2014 (PRUCO 000071—3, & 000097—98), and were confirmed with a lab slip of the same date (PRUCO 000099). I found no document where the examiner completed any medical questions on Ballinger. In addition, the underwriter's review of the requirements does not indicate any review of medical questions other than those answered on the application by telephone.

34. Pauls' statements regarding the examination process on 11-7-14 are not credible. For the testing required by Pruco (ECG, exam, and IRP) the typical time to complete the process would have been 30-45 minutes and not more than two hours (Pauls' Deposition, page 87, lines 14—23). For the collection of a blood sample, the quantity of blood drawn would be no more than 2 vials and not twelve (Pauls' Deposition, page 88, lines 21—25; and page 91, lines 1—5). A medical examiner, unless he or she was a licensed doctor, would not have checked the heart or the lungs (Paul's Deposition, page 89, lines 5—6).

35. Pauls' statements regarding the examiner taking of a medical history from Ballinger for the Pruco application are not credible. There is no documentation that medical questions were asked by the examiner and answered by Ballinger. Pruco's age and amount requirements did not require the examiner to ask the proposed insured medical questions. As stated on Pruco's age and amount requirements (Pruco 000995), the examination was limited to the recording of an ECG; measurement of height, weight, blood pressure, and pulse; and the collection of a blood and urine sample. This document further states that the Tele-Underwriting interview obtains the Part 2 Medical Declarations which is what occurred in the underwriting of Ballinger.

7 Expert Witness Report, J. Daniel Perkins

36. Pauls' statement regarding the examiner's alleged instructions regarding the taking of a medical history from Ballinger for the Pruco application are not credible (Pauls' Deposition Page 89, lines 7—20). Based on my professional underwriting background and experience, and prior employment with a company that completed insurance exams, the examiners are trained and have procedures in place not to ask or discuss medical history unless a medical history document is being completed. Further, if the examiner had been asked to complete medical questions on Ballinger, the purpose would have been to obtain as much detailed information as possible regarding his medical history and physicians seen. Any information collected would have been compared to the prior questions on the application to confirm if the documents differed in the information provided. Under no circumstance would it have been the policy of the examination company to instruct its examiner to inform Ballinger that he did not need to provide his medical history since it would all be obtained by Pruco.

37. Ballinger did not admit to his diagnosis of BPH, elevated PSA, and results of his 8-12-13 prostate biopsy. BPH and prostate cancers are the two most frequently seen prostate disorders in life underwriting, and have similar presentations as to physical findings and diagnostic test results. Medical studies have shown that the incidence of both of these disorders significantly increase starting around age 50.

38. Due to the increased incidence rates of these disorders, and Ballinger's age 57-58 at time of underwriting, it would have been normal and customary underwriting practice to obtain medical records for any admitted prostate disorder or disease, even with a PSA value of 3.31 on the insurance lab stated to be within a normal range.

39. If Ballinger had admitted to his prostate history on the application and his attending urologist, the normal and customary underwriting practice would have been for Pruco to request medical records from Dr. Saddiq and possibly Dr. Digiglia. Upon receipt of these medical records, Pruco would have postponed consideration of life coverage and not offered coverage on any basis.

40. Postponement of consideration for life insurance occurs when there is a potential mortality risk associated with the proposed insured for which there is incomplete information upon which to make a mortality assessment. For Ballinger, this was present due to his prostate history. Due to Ballinger's PSA readings and prostate biopsy findings, there was an ongoing possibility of him developing prostate cancer. Medically this ongoing possibility of developing cancer was treated by ongoing surveillance by Dr. Saddiq.

41. Pruco's guidance on making the determination to postpone consideration would have resulted from the use of the medical records from Saddiq and Digiglia and Pruco's insurance test results applied to its underwriting manual on prostate and prostate diagnostic testing. Whereas in medicine, where there is ongoing surveillance and treatment options

8 Expert Witness Report, J. Daniel Perkins

that can be changed as the circumstances dictate, the underwriting analysis for life insurance is a moment-in-time decision which must take in to consideration the probability of a future event based only on the information known at time of underwriting.

42. From Prostate, Exhibit 14, page 4 (PRUCO 001008), can be found the rating scheme where there is a finding of atypia within the past 10 years. The prostate biopsy of 8-12-13 showed atypical glands, suspicious for carcinoma. The rating scheme states to rate this finding the same as "Prostate Adenocarcinoma Gleason 2, Active Surveillance."

43. From Prostate Cancer, Exhibit 16, page 1 (PRUCO 001009), the Underwriting Action section reiterates using Gleason 2 for other atypia within the past 10 years. The remaining bullets under that section do not apply to Ballinger's situation except for compliance with the urologist's recommended surveillance plan. In reviewing the rating box matrix, Ballinger does not fit within this rating scheme since he was age 57-58 at time of underwriting. That leaves the only possible rating assessment as Individual Consideration which states the case is postponed until both the following are true, then IC (Individual Consideration) by medical department: 1) PSA has been stable $\geq$ 2 years, and current age $\geq$ 50. Since Ballinger only met the age requirement, Ballinger would have been postponed until his PSA had been stable for $\geq$ 2 years.

44. The analysis using Pruco's rating scheme would have resulted in a postponement of consideration for coverage for at least 2 years from the time of the insurance PSA result of 3.31 from Pruco's testing from 11-7-14 (PRUCO 00097—8). This start date is used due to the significant rise of Ballinger's PSA from 1.79 from 8-18-14 found in the medical records cited to the insurance PSA of 3.31. The PSA velocity calculated for this time period is 7.0 which per Exhibit 14, page 3 (PRUCO 001007) is strongly associated with subsequent death due to prostate cancer.

45. Based on my professional underwriting background and experience, it is my opinion that based on the unadmitted medical history that could have been available at the time Pruco underwrote Ballinger for life coverage, and based on Pruco's underwriting guidelines, Pruco would have postponed consideration for life coverage and not issued the Policy.

C. **Opinion as to whether Pruco followed normal and customary professional underwriting practices, and was Pruco's underwriting of Ballinger's life reasonable and prudent based upon the information disclosed by Ballinger.**

**Pruco's underwriting of Ballinger was correct and followed normal and customary professional underwriting practices. Pruco's underwriting was reasonable and prudent based upon the information disclosed by Ballinger.**

46. Based on Ballinger age 57-58 at time of underwriting and the requested $500,000 of life coverage, Pruco followed its age and amount requirements and requested an ECG;

9 Expert Witness Report, J. Daniel Perkins

measurement of height, weight, blood pressure, and pulse; and the collection of a blood and urine sample to be completed on Ballinger. As per Pruco's age and amount requirements, it was not necessary to obtain a medical history as part of this exam since the medical questions were completed by telephone at time of application. Further, Pruco's age and amount requirements did not require Pruco to routinely obtain an APS from any attending physician of Ballinger. Pruco's underwriting was reasonable and prudent based upon the information disclosed by Ballinger at the time the application with medical questions was completed.

47. Although not required as an age and amount requirement, an APS will be requested on a "for cause basis." A "for cause" APS is obtained when possibly significant medical history is admitted by the proposed insured or when such information is developed as part of the underwriting process. If Ballinger had admitted to his prostate history on the application and his attending urologist, the normal and customary underwriting practice would have been for Pruco to request medical records from Dr. Saddiq and possibly Dr. Digiglia.

48. If Ballinger had admitted to his prostate history on the application and his attending urologist, Pruco would have followed normal and customary underwriting practice by obtaining a "for cause" APS from Dr. Saddiq and possibly Dr. Digiglia. Upon receipt of those medical records, and applying Ballinger's prostate history to Pruco's underwriting guidelines for prostate disorder, Pruco would have followed normal and customary underwriting practice by postponing consideration of coverage on Ballinger's life.

49. Based on my professional underwriting background and experience, Pruco's underwriting of Ballinger was correct and followed normal and customary professional underwriting practices. Pruco's underwriting was reasonable and prudent based upon the information disclosed by Ballinger.

## **CONCLUSION**

It is my professional underwriting opinion that Ballinger's answers to Questions 1.j., 4.b., 4.c., and 4.d. of the Application Part 2, Section D, entitled "Medical Information," were misrepresentations of his medical history by failing to disclose the blood work and medical testing relating to his prostate at the time of application for this policy.

It is my professional underwriting opinion that Ballinger's misrepresentations were intended to have Pruco issue life coverage on his person.

It is my professional underwriting opinion that the misrepresentations were material based on the unadmitted medical history that could have been available at the time Pruco underwrote Ballinger for life coverage, and based on Pruco's underwriting guidelines, Pruco would have postponed consideration for life coverage and not issued the Policy.

It is my professional underwriting opinion that Ballinger made misrepresentations that were material with the intent to deceive Pruco to issue coverage on his life which otherwise Pruco would not have done if Ballinger had disclosed his prostate history.

It is my professional underwriting opinion that Pruco's underwriting of Ballinger was correct and followed normal and customary professional underwriting practices. Pruco's underwriting was reasonable and prudent based upon the information disclosed by Ballinger.

_J. Danl Perkins_     3-17-17
J. DANIEL PERKINS     DATE

EXHIBIT A

## **BACKGROUND AND QUALIFICATIONS**

I have over thirty years of professional experience in life insurance and life reinsurance at companies including SCOR Global Life U.S. Re Insurance Company ("SCOR Re") and Optimum Re Insurance Company ("Optimum Re"). Most of my career has been as a life reinsurance underwriter. In this capacity, I reviewed facultative submissions from client companies on proposed insureds for life insurance. I also have experience as an underwriter for direct companies.

From May 2006 to April 2008, I was employed by SCOR Re as Vice President, Risk Management where I was responsible for the Underwriting, Claims, and Treaty Departments. For underwriting, my duties included, but were not limited to, the supervision and training of underwriters; setting policy, procedures, and criteria as to the review of facultative submissions from client companies; and reviewing underwriting cases on a daily basis. As part of my job duties, it was normal and customary for me to review underwriting manuals, age and amount requirements, preferred criteria, etc. from direct companies, as well as underwriting manuals from other reinsurance companies

As head of the Treaty Department, I was responsible for approving not only underwriting-related treaty language but the approval of all treaty language subject to input and advice from the other functional areas of the company involved in the process.

For claims, I reviewed contestable claims from an underwriting standpoint to determine two primary issues: 1) Did the direct insurance carrier underwrite and assess the mortality risk within acceptable parameters and/or its underwriting guidelines?; and 2) Did any misrepresentation occur on the part of the insured and/or policy owner which would be considered material?

Six months prior to leaving SCOR Re, I was appointed Vice President, Research & Development to help develop SCOR Re's new underwriting manual, set policies and guidelines regarding underwriting best practices, and assist with audits and ad hoc projects.

From November 1988 to July 2003, I was employed by Optimum Re first as a Senior Underwriter, then later as Assistant Vice President, Underwriting. During my last five years with Optimum, I was Director, Underwriting Research where I worked to revise sections of the company's underwriting manual.

From 1984 to 1988, I was employed as a life underwriter at direct companies including Southwestern Life, Southland Life, and National Fidelity Life.

During my professional insurance career, I obtained the Fellow, Academy of Life Underwriting; Fellow, Life Management Institute; and the Charter Life Underwriter designations. I have been a Contributing Editor for *On The Risk*, and a member of the following committees: Education

Committee of the ALU, Underwriting Experience Studies Committee, and Mortality and Morbidity Liaison Committee.

I have written over 30 articles on a broad range of topics involving life insurance underwriting. My articles have appeared in *On The Risk*, the ALU exam series, the Society of Actuaries Study Notes, Connecticut Insurance Law Journal, and the Tort Trial and Insurance Practice Law Journal. I am an occasional speaker at local, regional, and national life insurance industry meetings.

From April 2008 to July 2009, I was employed as Vice President, Sales for Heritage Labs International where I managed Heritage's sales team to increase its market share of insurance laboratory testing products and services. During my tenure at Heritage Labs, the company was a subsidiary of Hooper Holmes. At that time, Hooper Holmes, through its subsidiaries, was a leading provider of medical examinations and blood/urine testing for insurance companies, performed telephone interviews with applicants for life coverage, as well as other life insurance/underwriting related services.

Since September 2009, I have been engaged in the practice of law as a member of the State Bar of Texas in good standing. My legal practice encompasses both civil litigation and criminal defense. I also practiced law from July 2003 until May 2006.

Since September 2009, I have offered life insurance consulting services regarding all aspect of underwriting. Part of this consulting service is as an expert witness regarding life insurance litigation. I am also currently engaged on an ongoing basis as an underwriter auditor where I review the work of life underwriters to determine if the underwriting process was completed within acceptable parameters as to the review of the medical and financial information with adherence to the company's underwriting manual, age and amount requirements, preferred guidelines, etc.

I have a Juris Doctor from Texas Wesleyan University School of Law (now known as Texas A&M University School of Law), a MBA in Finance from the University of Texas at Dallas, a MA in International Management Studies from the University of Texas at Dallas, and a BBA in Management from Texas A&M University.

## PUBLICATIONS AUTHORED IN THE PAST FOURTEEN YEARS

1. *The Legal Morass of Reinstatement Underwriting*, ON THE RISK, Jan.-March 2013, at 67.
2. *DWI's – What About The Other 50%?*, ON THE RISK, Jan.-March 2012, at 38.
3. *Professional Underwriter Equals Expert Witness*, ON THE RISK, April-June 2010, at 26.
4. INVESTOR-OWNED LIFE INSURANCE: *The Perfect Storm of Life Underwriting*, ON THE RISK, April-June 2008, at 14.

2 Exhibit A, Expert Witness Report, J. Daniel Perkins

5. *Negligence, Underwriting, and Contracts: open letter to Hank George, no. 1*, ON THE RISK, Jan.-March 2006, at 72.
6. *The Role of the Medical Director in the Risk Assessment Process*, 37 J INSURANCE MEDICINE 136 (2005).
7. *A Policy of Murder, Part II: More Case Studies*, ON THE RISK, July-Sept. 2004, at 48.
8. *A Policy of Murder: Life Insurance Wrongful Death Cases*, ON THE RISK, April-June 2004, at 67.
9. *Antitrust, Unfair Discrimination, and Sound Actuarial Principles*, THE INS. POLICY (ABA/Section on Antitrust Law/Insurance Committee) Fall 2003, at 4.
10. *Life Insurance Risk Classification: Finding the Boundary Between Antitrust and Unfair Discrimination*, 9 CONN. INS. L.J. 527 (2003)


**LIST OF CASES WHERE PROVIDED EXPERT TESTIMONY**

Case No. S-1500-FL-591767, Superior Court of the State of California, County of Kern—Metropolitan Division; *In re Marriage of Becky J. Burwell and Gary J. Burwell*. Provided report and testimony for Respondent. Year 2016.

Civil Action No. 5:15-cv-00798-OLG, United States District Court, Western District of Texas, San Antonio Division; *Robert O. Gonzalez, Jr. v. Massachusetts Mutual Life Insurance Company*. Provided report for Plaintiff. Year 2015.

Case No. 8:14-CV-03123-GJH, United States District Court of Maryland, Greenbelt Division; *Lakeisha Robinson Bowie v. AAA Life Insurance Company*. Provided report for Plaintiff. Year 2015.

Civil Action No. 3:12-CV-0028-RLY-WGJ, United States District Court, Southern District of Indiana, Evansville Division; *Steve Coldren, et al v. American General Life Insurance Company*. Provided report for Defendant. Year 2013.

Index No. 101353/10, Supreme Court For The State Of New York, County Of New York; *The United States Life Insurance Company In The City Of New York v. Solomon Menche, et al*. Provided report for Plaintiff. Year 2013.

Case No. 4:09-CV-118 M, United States District Court, Western District Of Kentucky, Owensboro Division; *Warren C. Helton, individually and 2013on behalf of The Warren C. Helton Irrevocable Trust v. American General Life Insurance Company*. Provided report and testimony for Defendant. Year 2012.

Civil Action No. 2:12-CV-00462, United States District Court For The District Of New Jersey; *AVIVA Life And Annuity Company v. The E. Rachel Irrevocable Trust, Dated July 15, 2007, et al*. Provided report for Plaintiff. Year 2012.

3 Exhibit A, Expert Witness Report, J. Daniel Perkins

Case No. 2011-0419H, In The Circuit Court Of Pearl River County, State Of Mississippi; *Mark Brooke, Attorney-In-Fact For Mauna P. Brooke v. American General Life Insurance Company.* Provided report for Defendant. Year 2012.

Case No. 3: 10-CV-173-p, United States District Court For The Northern District Of Texas – Dallas Division; *The Lincoln National Life Insurance Company v. Cowboy Athletics, Inc., and T. Boone Pickens; Cowboy Athletics, Inc. and T. Boone Pickens v. The Lincoln National Life Insurance Company; Cowboy Athletics, Inc. and T. Boone Pickens v. Management Compensation Group\*Lee Inc., John Ridings Lee, John Ridings Lee Company, Inc., James Glenn Turner, Jr., Larry Anders, Summit Alliance Financial, L.L.P.* Provided report and testimony for Parties Cowboy Athletics, Inc. and T. Boone Pickens, Plaintiffs. Years 2011—12.

Case No. CV 09-6822 ODW (AJWx), United States District Court, Central District of California; *BGI Life, Inc., a Florida Corporation v. American General Life Insurance Company, a Delaware Corporation.* Provided report and testimony for Defendant. Years 2010—11.

Civil Action No. 09-CV-014960-MSK-MEH, United States District Court of the District of Colorado; *Watershed LLC, a Republic of Seychellles Limited Liability Company v. Columbus Life Insurance Company.* Provided report and testimony for the Defendant. Years 2010—11.

IN THE MATTER OF THE ARBITRATION BETWEEN: Pacific Life Insurance Company, Petitioner v. Swiss Re Life & Health America, Inc., Respondent. Provided testimony for the Petitioner. Year 2010.

### STATEMENT OF COMPENSATION

I am compensated for my time at an hourly rate of $250.00 plus expenses. My fee is not contingent on the outcome of the case or any evaluation of my report or my testimony.